UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRANDT O. BRENNAN,

CASE NO. 18-10766

*Plaintiff*,                    DISTRICT JUDGE NANCY G. EDMUNDS

*v.*                              MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

*Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (R. 17, 20)

## I.      RECOMMENDATION

Plaintiff Brandt Brennan challenges defendant Commissioner's final decision denying his application for disability benefits. In light of the record, I suggest that substantial evidence supports the Commissioner's decision. Accordingly, I recommend that Plaintiff's Motion for Summary Judgment, (R. 17), be **DENIED**, the Commissioner's Motion, (R. 20), be **GRANTED**, the Commissioner's final decision denying benefits be **AFFIRMED**.

## II.     REPORT

### A.      Introduction and Procedural History[1]

Plaintiff applied for Title II Disability Insurance Benefits (DIB) on April 30, 2015,

---

[1] Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, (R. 4), this case was referred to me to review the Commissioner's final decision denying Plaintiff's claim for Disability Insurance Benefits.

alleging that his disability had begun roughly three years before. (R. 14, at PageID.131.) The Commissioner denied the claim. (*Id.*) Plaintiff then requested a hearing before an administrative law judge (ALJ), which occurred on August 16, 2016. (R. 14, at PageID.92-128.)  The ALJ issued a decision on February 22, 2017, finding Plaintiff not disabled during the relevant period. (R. 14, at PageID.67-85.) On December 8, 2017, the Appeals Council denied review, (R. 14, at PageID.51-54), and Plaintiff sought judicial review on March 7, 2018. (R. 1).[2] He then filed the instant Motion for Summary Judgment on July 9, 2018, (R. 17), and the Commissioner countered with its own Motion, (R. 20). Plaintiff has replied, (R. 22), and the case is now ready for resolution.

## B.     Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks

---

[2] The limitations period for seeking judicial review after the Commissioner's decision is 60 days. 42 U.S.C. § 405(g); *see also Cook v. Comm'r of Soc. Sec.*, 480 F.3d 432, 435 (6th Cir. 2007). Plaintiff admits he filed past the deadline, adding, however, that he requested a filing extension from the Commissioner under Soc. Sec. Admin., *Hearings, Appeals, and Litigation Law Manual*, § I-3-9-92, 1993 WL 751914, (May 1, 2017). (R. 1, at PageID.2.) Neither party says whether the extension was granted. Because the limitations period is waivable, *Weinberger v. Salfi*, 422 U.S. 749, 764 (1975), and Defendant fails to raise it as a defense, Plaintiff's claim is not time-barred and the Court can reach the merits, *see Walker v. Sec'y of Health, Educ. & Welfare*, 449 F. Supp. 63, 64 (E.D. Mich. 1978) ("In light of the Supreme Court's view in *Salfi*, supra, . . . that the 60 day requirement is a statute of limitations which can be waived, and in view of the fact that the Secretary, in his answer in the instant case has chosen not to raise the statute of limitations, the timeliness of the complaint is not an issue."); *see also Hollis v. Comm'r of Soc. Sec.*, No. 13–13054, 2015 WL 357133, at * 2 n. 2 (E.D. Mich. Jan. 27, 2015) (citing *Walker*); 30 Fed. Proc., L. Ed. § 71:626 (same).

omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

## C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

3

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

4

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (R. 14, at PageID.85.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of November 18, 2014. (R. 14, at PageID.69.)[3] At step two, the ALJ concluded that Plaintiff had the following severe impairments: traumatic brain injury from September 1988; cognitive and mood disorders, not otherwise specified; alcohol dependence; and depression. (R. 14, at PageID.70.) The ALJ also decided, however, that these impairments did not meet or medically equal a listed impairment at step three. (R. 14, at PageID.71-74, 77.) Next, the ALJ found that Plaintiff had the RFC to perform

> a full range of work at all exertional levels but with the following nonexertional limitations: no climbing ladders, ropes, or scaffolds; avoid all use of hazardous moving machinery; avoid all exposure to unprotected heights; work is limited to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decisions with few if any workplace changes; brief

---

[3] The ALJ observed that the salary at one post-onset job, at Menards, was high enough to qualify as substantial gainful employment, but because Plaintiff's impairments forced him to stop working, the job constituted an unsuccessful work attempt and was not substantial gainful employment. (R. 14, at PageID.70 (citing 20 C.F.R. § 404.1574).)

> superficial interaction with the public, coworkers, and supervisors; and, due to mental impairments, he would not be able to sustain sufficient concentration, persistence, or pace to stay on task even 80% of an 8-hour workday.

(R. 14, at PageID.74.) If, however, Plaintiff ceased his substance abuse, he would have the same RFC except the last limitation—on concentration, persistence, and pace—would be eliminated. (R. 14, at PageID.79.) At step four, the ALJ found Plaintiff unable to perform any past relevant work if his substance abuse continued, but he could perform past work as a mail clerk if he stopped using substances. (R. 14, at PageID.75, 82.) The ALJ reached step five only to determine that if Plaintiff continued his substance abuse, he could not perform a significant number of jobs in the national economy. (R. 14, at PageID.76.)

As discussed more below, if a claimant is found disabled and substance abuse materially contributes to the disability, the claimant cannot obtain benefits. 20 C.F.R. § 404.1535. Here, because substance abuse materially contributed to the disability determination—Plaintiff would not be disabled but for the abuse—the ALJ concluded that Plaintiff was not disabled. (R. 14, at PageID.84 (citing 20 C.F.R. § 404.1535).)

### E.    Administrative Record

#### 1.    Overview of the Medical Evidence

In September 1988, Plaintiff suffered a traumatic brain injury during a car accident, leading to emotional and behavioral problems. (R. 14, at PageID.326.) According to notes by Dr. Owen Perlman, written in 2014, Plaintiff experienced seizures after the accident and "underwent a prolonged course of post-acute rehabilitation." (R. 14, at PageID.364.) Nonetheless, he completed his studies at Michigan State University and graduated in

December 1993, then went to work for the Teamsters. (R. 14, at PageID.433.) "He subsequently did well in the semi-independent living program through Dignitas and was discharged from residential programming on 10/1/10." (R. 14, at PageID.364.) The transition home was rough, though, and Plaintiff returned to Dignitas in August 2012 and thereafter remained "either in the group home or the apartment program." (*Id.*) During this time, Plaintiff drank, even while at work. (*Id.*) More recently, he left Dignitas "against medical advice" but "was able to maintain his Guardianship through the Probate Court, even though [Dr. Perlman] had recommended that a guardian be appointed in [*sic*] his behalf." (*Id.*)

In January 2014, Plaintiff saw Dr. Elliot Wagenheim. (*Id.*) At the time, Plaintiff was working for the Teamsters and trying to remain sober. (*Id.*) He attended sobriety meetings, considered signing up for an online dating service, and pondered "volunteering at the MSU extension service." (*Id.*) He lived on his own. (*Id.*) He "reported no significant mood or anxiety problems" requiring pharmaceutical intervention, and no new headaches, seizures, or motor problems. (*Id.*) The psychiatric examination produced normal results, with appropriate orientation, mood, attention, concentration, memory, thought process, and associations; his gait was within normal limits but mildly ataxic, and his speech was mildly

dysarthric. (*Id.*)[4] Overall, Plaintiff was stable, according to Dr. Wagenheim. (*Id.*)[5]

In February 2014, Dr. Perlman wrote that Plaintiff had traumatic brain injury and "mood disorder coupled with a dependency [on] alcohol." (R. 14, at PageID.363.)[6] In addition, prior records indicated use of street drugs. (*Id.*) As far as Dr. Perlman knew, Plaintiff still attended counselling sessions and Alcoholics Anonymous (AA) meetings. (*Id.*) He also had signed up at a gym and had considered volunteering, although he had not yet volunteered and it was unclear to Dr. Perlman how frequently he went to the gym. (*Id.*) Dr. Perlman recommended that he abstain from alcohol and drugs, and that "[i]f he is unsuccessful, [he] get involved in transitional housing for patients with addiction." (*Id.*) Dr. Perlman also wrote that he should have the "option[] of . . . returning to supervised Traumatic Brain Injury Treatment Program at Dignitas with the social-recreational integration program, and self-medication program with assistance." (*Id.*)

Three months later, Plaintiff reported to Dr. Wagenheim that conflict with a coworker and persistent traffic construction had caused him stress and pushed him closer to relapse, which he sought to avoid with Antabuse. (R. 14, at PageID.327.) He had signed up for a self-hypnosis class to learn how to quit smoking, and considered taking a few

---

[4] Ataxia is "a lack of muscle control or coordination of voluntary movements[.]" Mayo Clinic, *Ataxia*, https://www.mayoclinic.org/diseases-conditions/ataxia/symptoms-causes/syc-20355652 (last accessed Mar. 11, 2019). "Dysarthria is a condition in which the muscles you use for speech are weak or you have difficulty controlling them." Mayo Clinic, *Dysarthria*, https://www.mayoclinic.org/diseases-conditions/dysarthria/symptoms-causes/syc-20371994 (last accessed Mar. 11, 2019).

[5] The same month, Plaintiff visited Dr. Robert Brateman for treatment of a persistent cough and headache after he fell while shoveling snow. (R. 14, at PageID.343.) The diagnosis was sinusitis, which was to be treated by a balanced diet, and bronchitis, which required "adequate rest." (R. 14, at PageID.344.)

[6] Dr. Perlman wrote that the accident causing the injury occurred in 1980, (*id.*); he was mistaken, as Plaintiff dates the accident in 1988, (R. 14, at PageID.289.)

8

cooking classes at a community college. (*Id.*) Apparently the cooking classes were appealing because he intended to open a bed-and-breakfast after he left the Teamsters. (*Id.*) Plaintiff also reported that his prescription medications, psychopharmaceuticals, had not produced adverse side effects, and that no changes had occurred in his general health. (*Id.*) On examination, Plaintiff was again largely normal, although on this occasion his mood was mildly distressed but also "stable" and "good." (*Id.*).

The following month, May 2014, the stressors remained but Plaintiff was navigating them well, maintaining his "stable" and "good" mood, attitude, and behavior. (R. 14, at PageID.328.) His urge to relapse had abated, but he continued to smoke despite the self-hypnosis class. (*Id.*) A Tigers baseball game was on his schedule for later in the month, and he had invited a friend to attend with him. (*Id.*) His examination results were normal, with his mood improving, although his gait remained mildly ataxic and his speech mildly dysarthric. (*Id.*) In June 2014 his mood stayed "good" despite new stressors, including the death of a close friend. (R. 14, at PageID.329.) He had plans to socialize with a coworker and also hoped to take a vacation golfing and scuba diving. (*Id.*) His examination results were the same as at the last appointment with Dr. Wagenheim. (*Id.*)

Plaintiff saw Dr. Perlman in June 2014, complaining of some dizziness, shortness of breath, and nausea. (R. 14, at PageID.358-359.) He also reported that he had been exercising and attending AA meetings, and had not had alcohol for six months. (R. 14, at PageID.358.) His physical examination results were normal, including normal muscle strength, coordination, and gait. (R. 14, at PageID.359.) His mood was anxious and depressed, he lacked "insight concerning matters relevant to self," lacked judgment on

daily activities and social situations, and had an "abnormal [fund of] knowledge, attention deficit, and calculations"; but his memory was normal, he had no impairment in abstract reasoning, and by all other measures he was normal. (R. 14, at PageID.360.)

In August 2014, Plaintiff told Dr. Wagenheim that he had relapsed recently under the stress of work, activities of daily living, upkeep on his parents' horse farm, and doctors' appointments. (R. 14, at PageID.330.) Nonetheless, his mood remained "relatively good" and his examination results stayed the same. (*Id.*) Two months later, he felt in a "particularly good mood" after receiving a compliment about his work quality and being told by his supervisor "that he was behaving more like 'the old Brandt.'" (R. 14, at PageID.331.) Sobriety had kept his work output high, he believed. (*Id.*) Socially, he had met a couple women, one of whom was interested in "going out with him." (*Id.*) His examination results were unchanged. (*Id.*)

Plaintiff returned to Dr. Perlman on October 13, 2014, stating that he had relapsed a few weeks earlier. (R. 14, at PageID.353.) Yet he was doing well, if a bit lonely, and had joined social groups to get connected. (*Id.*) Work was "not too bad. He has a couple of coworkers he does not agree with, but he denies being in any jeopardy for his job." (*Id.*) Overall, his condition and mood were stable. (*Id.*) The examination results, both physical and psychiatric, were the same as at the last visit. (R. 14, at PageID.354-355.)[7]

At his next session with Dr. Perlman, Plaintiff explained that in November 2014 he was "terminated form his job in the mailroom at Teamsters . . . after he tested positive for

---

[7] In December 2014, Dr. Stuart Gordon saw Plaintiff to treat his hepatitis C. (R. 14, at PageID.350.) Relevant here, the "review of systems" and examination sections of Dr. Gordon's medical notes, which included psychiatric health, did not uncover any abnormalities aside from diarrhea and nausea. (R. 14, at PageID.351-352.)

alcohol while at work with the use of a Breathalyzer." (R. 14, at PageID.345.) In the past, he had been suspended for drinking at work. (*Id.*) But this time he denied having done so, and was working with the union to challenge his firing. (*Id.*) He was searching for work and had obtained a job offer. (*Id.*) Presently, he maintained his own home but resided at his parents'. (*Id.*) Elaborating on his living arrangement, "he acknowledged continuing to drink alcohol while he was at home, so his parents had him living at their home in an attempt to keep him sober." (*Id.*) Yet he continued to drink even there, and had not been attending AA. (R. 14, at PageID.345-346.) He was depressed, fatigued, losing weight, anxious, short of breath, and dizzy. (R. 14, at PageID.346.) The examination results were the same as the others. (R. 14, at PageID.347.)

The record contains a January 2015 report from Stephanie Chapman, a counselor at Sacred Heart Rehabilitation Center. (R. 14, at PageID.333-335.) Plaintiff went there on December 31, 2014, for detoxification and residential treatment, staying until January 12, 2015. (R. 14, at PageID.333.) Chapman thought that Plaintiff's relapse risk and need for an appropriate recovery environment were high priorities for further treatment, while his emotional state and behaviors were "medium." (R. 14, at PageID.334.) The discharge form included results from a mental status examination that found Plaintiff appropriately oriented and with intact memory, congruent affect, fair judgment and insight, and appropriate thought content. (*Id.*) The diagnoses were depression and alcohol and cocaine dependence. (*Id.*)

In February 2015, Plaintiff again saw Dr. Wagenheim, presenting "in a somewhat depressed mood" and reporting his recent positive alcohol test at work. (R. 14, at

PageID.465.) This was not the first time he had been fired for drinking, he reported. In February 2002, he had been let go after his blood-alcohol level reached 0.2, but subsequently had been rehired. (*Id.*) On this occasion, however, Plaintiff was not "sure . . . whether he wants to go back to the Teamsters," and instead he had been searching for work elsewhere. (*Id.*) The examination results remained unchanged: aside from mild ataxic gait and mild dysarthric speech, his mood and affect were "status/quo/stable/good" and he was otherwise normal. (*Id.*) Dr. Wagenheim believed that Plaintiff needed treatment, medication and therapy, "due to his high probability of regression/relapse without it." (*Id.*)

In April 2015 and again in June, Plaintiff saw Dr. Wagenheim. (R. 14, at PageID.466-467.) At the first appointment, he was in good spirits, without any mood, attitude, or behavior problems over the past few months. (R. 14, at PageID.466.) Work on his parents' farm had kept him busy, and while he was not dating, he regularly talked with his ex-girlfriend and had joined a "singles hiking and biking group." (*Id.*) Each day, he sent out a steady stream of job applications, and he had recently interviewed for a position. (*Id.*) His last drink had been in February. (*Id.*)

In June, he was distressed when he was denied unemployment benefits and his dispute with the Teamsters continued to drag on. (R. 14, at PageID.467.) He again explained that he had been fired for registering 0.01 blood-alcohol level when the contract required a 0.05 level for termination. (*Id.*) The social groups he joined had given him an outlet, enabling him to attend numerous events. (*Id.*) Aside from his mild distress, the psychiatric examination results mirrored the previous session's. (*Id.*)

From 2014 through 2016, Plaintiff received counseling from Dr. Ray Kamoo. (R.

14, at PageID.396-431, 473-487.) The notes indicate that Plaintiff had "gone great stretches of time without any difficulties," but temptations persisted and "his compromised capacities continue to make him vulnerable." (R. 14, at PageID.431; *see also* R. 14, at PageID.410, 419-424.) Elaborating, Dr. Kamoo discussed Plaintiff's addiction and stated they "talked about the accident, and its relation to these issues [i.e., alcoholism], and he clearly has an understanding that is [*sic*] compromised capacities stemming from the accident also put him at increased risk." (R. 14, at PageID.419; *see also* R. 14, at PageID.404, 406, 407, 410, 411, 415 (noting Plaintiff was not a "drinker" before the accident), 417.) The psychologist also "remained convinced that the difficulties he's had with substances and the like, at least since the accident, is related to his diminished perceptions of self and what he feels his worth is." (R. 14, at PageID.421; *see also* R. 14, at PageID.412, 415, 416 (noting Plaintiff's belief that, "other than his compromised capacities," loneliness had led to his alcoholism).)

In many sessions, Plaintiff discussed his efforts at sobriety and his attempts to form healthy relationships, which "continue[d] to be difficult for him, in light of his compromised capacities." (R. 14, at PageID.429; *see also* R. 14, at PageID.409, 411, 412, 413, 416, 417, 423, 427, 429, 425-429, 473.) Dr. Kamoo noted that Plaintiff was "seemingly vigilant" about battling addiction "as well as the depressive and anxiety symptoms that do arise from time to time." (R. 14, at PageID.426.) Another session note mentioned "some mild depressive symptomatology" Plaintiff was experiencing. (R. 14, at PageID.425.) Later, Dr. Kamoo speculated that the "depressive symptomatology is probably more pervasive than he is leading on." (R. 14, at PageID.418.)

13

At a few sessions with Dr. Kamoo, Plaintiff discussed work issues and stressors, although the notes do not recount specifics.  (R. 14, at PageID.409, 412, 414, 416, 419, 420, 421, 422, 428.) "[M]inor conflicts" kept occurring at his job, Dr. Kamoo observed. (R. 14, at PageID.421.) In October 2014, the notes indicate that Plaintiff had been reinstated at work, without further explanation. (R. 14, at PageID.410.) The following month, the notes state that a relapse, which Plaintiff had successfully warded off for the past few weeks, would threaten his continued employment. (R. 14, at PageID.409.) But at the following session Plaintiff related "his recent suspension due to alleged alcohol use. He then showed me the letter that supported this," but explained that it had been rescinded because "[h]e had gone to get a breath alcohol test, which is 0.0." (R. 14, at PageID.408.) Following up at the next appointment, Plaintiff explained that he feared for his job after being sent home when a breathalyzer reading at work came back positive, although he denied drinking. (R. 14, at PageID.407.) He continued trying to regain his job later in the month, recalling to Dr. Kamoo "previous episodes where he was having difficulties at work, due to his substance use." (R. 14, at PageID.406; *see also* R. 14, at PageID.402-405.)

During much of this period, he lived with his parents. (R. 14, at PageID.401, 403.) "This appears to be forced on him, and his parents remain concerned about his independence and his willingness to use substances, primarily alcohol." (R. 14, at PageID.405.) He grated at their constant monitoring, but "he understands why they are doing this. We spoke about these struggles in the context of his addictions." (R. 14, at PageID.400; *see also* R. 14, at PageID.396, 397 ("[He] continu[ed] to live at his parent's house. He commented that it was going relatively well, and that they were keeping a strange

14

hold on him, trying to ensure that he does not drink.").) He reaffirmed later that "their presence is helping him to remain away from alcohol." (R. 14, at PageID.399.) Working helped him bide his time, although he "struggle[ed] to find work that will get him back to his home base." (R. 14, at PageID.396.)

Despite all these efforts, he periodically drank. (R. 14, at PageID.398; *see also* R. 14, at PageID.450 (report from December 2015 that he continued to drink daily).) In April 2015, he and Dr. Kamoo discussed day programs and inpatient hospitalizations, but recognized these options had not proved successful in the past. (R. 14, at PageID.398.)

By June 2015, he found employment at a restaurant, where he was "enjoying his work and . . . increasing his social network." (R. 14, at PageID.474.) According to Dr. Kamoo's notes, Plaintiff felt that "between his work[] and his seeming lack of desire for alcohol . . . there are no major issues that are triggers for him." (*Id.*; *see also* R. 14, at PageID.475 (noting that he enjoyed his work and felt happy).) But by August he had lost the job, reporting that he was told his pace was too slow. (R. 14, at PageID.476.) The following month, he was "in good spirits," explaining "how he continues to function at home, independent of his parents," and had obtained a new job at Menards. (R. 14, at PageID.477.)

After many weeks of silence, Dr. Kamoo contacted Plaintiff, discovering that he was now at a new job and was again drinking. (R. 14, at PageID.478.) But it was months before they next met, in February 2016, at which time Plaintiff "acknowledge[d] the power that alcohol has over him, and that coupled with his compromised capacities, makes [*sic*] things very difficult. For the past week or so he has moved back home, a mechanism that

prevents them [*sic*] from drinking." (R. 14, at PageID.479.) When they saw each other again the same month, Plaintiff had been offered a job at Meijer. (R. 14, at PageID.480.) "He talked about the importance of finding work, not only for attaining money but also for keeping him busy and distracted away from thinking about any alcohol or other substances." (*Id.*)

Plaintiff underwent a series of neuropsychological evaluations administered by Dr. Charles Seigerman in May and June 2015. (R. 14, at PageID.433.) Dr. Seigerman first saw Plaintiff in 1988, shortly after the accident, but had not examined him since. (*Id.*) Plaintiff explained that his job at the Teamsters had been to process claims, but "he was too slow and went back to the mailroom. He notes that he was given a breathalyzer test in November [2014] and blew .01. He notes he was fired because of that." (*Id.*) However, he had just found work as a chef, although Dr. Seigerman thought it "unclear whether or not the patient can be successful on this job without assistance." (R. 14, at PageID.439.) He continued to live with parents despite owning a home. (R. 14, at PageID.433.) It had been a month since he drank, and many years since he used recreational drugs. (R. 14, at PageID.434.) Dizziness and falling spells had continued, and he added that his memory was poor, he was uncoordinated, his mood was "okay," he did not have anxiety, and that his hepatitis C caused fatigue. (R. 14, at PageID.435.)[8] Dr. Seigerman wrote that "[t]here were no indications of emotional internalizing dysfunction (mood disorder), thought dysfunction,

---

[8] A later report, from December 2015, explained that his hepatitis C had been cured, as confirmed by test results. (R. 14, at PageID.449.) In the report, Plaintiff's psychiatric "review of systems" noted depression and alcohol abuse, although the physical and neurological examination results were normal. (R. 14, at PageID.451-452.)

or behavioral dysfunction." (*Id.*) He thought Plaintiff's speech was normal, anxiety average, affect appropriate, mood euthymic, frustration tolerance average, and thought process intact. (*Id.*)

The test results were mixed. On some scores, Plaintiff rated low—in the mildly to moderately impaired level. (R. 14, at PageID.436.) On letter/number sequencing he was in the 2nd percentile, but he performed in the 47th percentile for "Spatial Span." (*Id.*) He was in the "low average to mild to moderately impaired" level for "speed of information processing abilities." (R. 14, at PageID.436.) Other scores, including some for verbal learning, were in the average range. (*Id.*)

Overall, he had a "mixture of cognitive strengths and weaknesses," Dr. Seigerman concluded. (R. 14, at PageID.439.) Deficits occurred in a number of areas, including vocabulary, fine motor control and speed, grip strength, and numerical operations. (*Id.*) Regarding his job at the Teamsters, Dr. Seigerman believed that his issues resulted "in part due to alcohol but more likely due to his cognitive problems from traumatic brain injury. The job was very routine though I suspect the patient may have actually begun to show a decline in cognitive abilities over time, which got to the point where he was too slow on the job." (*Id.*) Going forward, Dr. Seigerman thought Plaintiff should apply for disability. (R. 14, at PageID.440.)

Plaintiff returned to Dr. Perlman in January 2016. (R. 14, at PageID.453.) Since being let go by the Teamsters, Plaintiff had worked at five jobs, losing them for various reasons: he was let go from the restaurant because his cooking was too slow; he called in sick too often at a few retail positions; and Menards fired him for drunkenness. (*Id.*) Over

the prior year, he had lived on-and-off at his parents, tending to relapse while there. (R. 14, at PageID.454.) He no longer could claim any close friendships, and he felt fatigued, short of breath, anxious, and depressed. (*Id.*) His muscle strength and tone were normal, as was his coordination; the neuropsychiatric examination results were the same as Dr. Perlman's previous findings. (R. 14, at PageID.455.)

The following month, Plaintiff showed up for his appointment with Dr. Wagenheim in a good mood, despite failing to take his medication regularly and having drunk in the previous month. (R. 14, at PageID.469.) Differing from his earlier account about losing the Menards position, he now said he had quit because Menards wanted him to work sales rather than the inventory position he had requested. (*Id.*) So his job search recommenced and he returned to live with his parents. (*Id.*) His mood had improved since the last session, which was the only difference in the examination results. (*Id.*) The good mood continued into March, at his next meeting with Dr. Wagenheim, despite a recent relapse. (R. 14, at PageID.470.) At the last recorded session with Dr. Wagenheim, in May 2016 Plaintiff showed up drunk. (R. 14, at PageID.471.) A residential treatment program was recommended. (*Id.*)

At his next meeting with Dr. Perlman, in April, he reported a new part-time job at Meijer, working about 18 hours on the weekends. (R. 14, at PageID.458.) He also claimed roughly 30 days of sobriety, and he had returned to living alone in his house. (*Id.*) The review of systems and examination results were the same as at the last session. (R. 14, at PageID.459-460.)

A guardianship hearing was upcoming, and he had agreed to accept a guardian. (R.

18

14, at PageID.461.) However, he was against letting his parents act as a co-guardian with another person, although his mother was eventually named co-guardian. (R. 14, at PageID.482-483.) He told Dr. Kamoo that he drank because he was unhappy. (*Id.*) "His inability to live at home independently is also lending itself to this [i.e., drinking], but he clearly understands the concern of other professionals about this being a fertile ground for him to try and drink on his own." (*Id.*) He believed, however, that he could live independently. (R. 14, at PageID.487.) In July, he attended a social event where others were drinking, yet he refrained from partaking. (R. 14, at PageID.485.)

Two letters appear at the end of the medical record. One is from Dignitas, Inc., signed by Nancy Adams on August 15, 2016. (R. 14, at PageID.495.) She explained that Plaintiff entered Dignitas's semi-independent program on December 1, 2007 due to his brain injury. (*Id.*) They assisted him with social interaction, memory, attention, and judgment, which allowed him to maintain employment and a social life. (*Id.*) Recurrent relapses required him to have 24-hour supervision at times. (*Id.*)

The second letter was from Linda Krumm, Plaintiff's medical case manager coordinating rehabilitation treatment since 2012. (R. 14, at PageID.497.) Written on September 5, 2016, the letter states that Dr. Perlman had "recently prescribed 24-hour/day attendant care and supervision for [Plaintiff] in order to allow him to reside in his own home" rather than living with his parents. (*Id.*)[9]

### 2. Application Reports and Administrative Hearing

---

[9] Though it post-dates the hearing, the letter was included in the list of exhibits appended to the ALJ's decision. (R. 14, at PageID.89.)

### i.      Plaintiff's Reports

Plaintiff completed an Adult Function Form on June 8, 2015, as part of his application for disability benefits. (R. 14, at PageID.289.) In it, he premised his claim for benefits on his mental health impairments, including memory loss and depression, limitations in his right side and legs, and dizziness and vision issues caused by medication. (R. 14, at PageID.282.) Before his illness, he could make "proper decisions" and run, and he had better balance. (R. 14, at PageID.283.) Now, he could not sleep through the night, he found buttoning his shirts difficult, and he used an electric razor to prevent cuts while shaving. (*Id.*) Though he needed reminders—via an alarm he set on his phone—to take medications, he did not need them for personal care. (R. 14, at PageID.284.) He cooked, daily, and could do light housework, if prompted by reminders from his mother. (*Id.*) Going out was not a problem, as he could walk, drive, ride, or bicycle. (R. 14, at PageID.285.)

Shopping and handling money were also within his capabilities, although he was not a diligent record keeper, he admitted. (*Id.*) His hobbies had decreased since the onset of his conditions, but he still gardened, watched television, went to the movies, and ate out whenever able; similarly, he spent time with others as often as he could, attending AA meetings and social groups. (R. 14, at PageID.286.) He feared he was "running out" of friends and family. (*Id.*) Maintaining concentration was difficult, and while he could finish projects, he needed frequent breaks. (R. 14, at PageID.287.) He followed written instructions "fairly well," and spoken instructions "ok," and his relationship with authorities was good, depending on how they projected their authority. (R. 14, at PageID.287-288.) Changes in his routine were not a problem, but he struggled to handle

stress well. (R. 14, at PageID.288.)

Summing up, he said, "My car accident happened in Sept. 1988. I was 19, now I am 46 so the things I did or was able to do are quite different. My abilities and desires have changed." (R. 14, at PageID.289.)

### ii.        Letter from Plaintiff's Mother

On August 13, 2016, Plaintiff's mother drafted a "To Whom it May Concern" letter to explain the "deficits" she had observed in Plaintiff while he stayed at her house over the past two years. (R. 14, at PageID.493.) Prior to his accident, Plaintiff had been active and social; now he lacked friends, tired easily, was quick to anger, needed a good deal of instruction when handed a task, struggled to understand things, and had a poor memory. (R. 14, at PageID.493.)

### iii.        Plaintiff's Testimony at the Administrative Hearing

Plaintiff's hearing took place on August 16, 2016. (R. 14, at PageID.90.) His representative explained at the start of proceedings that the disability claim was based on the brain injury and the resulting mood disorder and substance-abuse disorder. (R. 14, at PageID.93.)

Plaintiff testified he was living with his parents, although he sometimes stayed at his own home, usually on days when he was working at Meijer handing out samples and answering questions about the products. (R. 14, at PageID.95.) He had had that job since February, generally working two or three days a week. (R. 14, at PageID.95-96.) When he was not working, he remained at his parents' because "[t]hey want to watch me, make sure I don't drink." (R. 14, at PageID.96.) It was a deterrent to drinking, he said, although his

case worker was trying to arrange for someone to stay with him at his home. (R. 14, at PageID.97.) He did better in structured environments, he stated, and that is what his parents offered "[b]ecause they don't drink." (R. 14, at PageID.99-100.)

At his parents, he worked on their property, mowing the 22 acres of land, gardening, occasionally cooking, cleaning, and also grocery shopping. (R. 14, at PageID.101-102.) He managed his laundry at his home. (R. 14, at PageID.103.) He drove himself places a few times a week, including to AA meetings. (R. 14, at PageID.106.) Since November 18, 2014—the alleged onset date—he had traveled once, with his parents to Chicago. (R. 14, at PageID.108.) He also liked to fish, golf, and garden, although he had not done the first two activities in some time. (R. 14, at PageID.109.) In his garden, he grew a medley of vegetables; in his parents' much larger garden, he helped with the planting and maintenance. (R. 14, at PageID.110.) He used to attend church every Sunday, but had not since he started his most recent job. (R. 14, at PageID.111.) He also enjoyed concerts and had attended a festival earlier in the year. (*Id.*) During a typical day he prepared meals, showered, helped in the garden, worked, cleaned his fish tank, watered plants, or cleaned the house. (R. 14, at PageID.114-115.)

Since his accident, he had struggled with alcohol. (R. 14, at PageID.96-97.) Yet, he had worked for several years after the accident, mostly in the mail room at the Teamsters. (R. 14, at PageID.97-98.) That job ended when he was fired after receiving several warnings and being given a breathalyzer every morning, blowing a 0.01 blood-alcohol level on the morning of his termination. (R. 14, at PageID.98.)

Plaintiff had worked a few jobs since leaving the Teamsters. (R. 14, at PageID.119.)

He was let go from a restaurant because he cooked slowly, and he lost a job at a grocery because he called in sick frequently. (R. 14, at PageID.119-120.) While working for Menards, he generally put in 10-hour days, but he was fired for drinking, which he said occurred the night before work but resulted in a positive breathalyzer test in the morning. (R. 14, at PageID.104.)

After trying other residential programs, Plaintiff had lived at Dignitas for a few years. (R. 14, at PageID.98-99, 120.) He could not remember exactly when he had moved out of the facility, but it was before his Teamsters job ended. (R. 14, at PageID.99.) He "just got tired of living there" and "wanted to move back home," he testified. (*Id.*) The decision to leave was his, not his doctor's. (R. 14, at PageID.105.) After leaving Dignitas, he began drinking again, which led to the loss of his job. (R. 14, at PageID.199.) He admitted that alcohol was still a struggle, and he had last drunk a month prior. (R. 14, at PageID.120.)

He took various medications to curb his drinking, along with Wellbutrin for his depression. (R. 14, at PageID.100.) The medications caused fatigue, but he also had trouble sleeping through the night and needed sleeping pills. (R. 14, at PageID.105-106.)

The accident diminished his ability to remember, causing him to need to reread or rehear instruction multiple times before they stuck and to require reminders for medications. (R. 14, at PageID.111.) Because he struggled with memory, he did not care for reading. (R. 14, at PageID.115.) He could concentrate on television for about two hours, the length of a movie, and he also spent a few hours each day on the computer, checking emails, social media, and entering time at his job. (R. 14, at PageID.112.) He also enjoyed

social interaction, which his work at Meijer facilitated, and he had no issues getting along with others. (R. 14, at PageID.113.) Twice he had been hospitalized for mental health issues, the first time for alcohol and drugs (the reason for the second was unstated). (R. 14, at PageID.113.114.)

Plaintiff also related that Krumm, his case manager, was helping arrange for a person to live with him full-time beginning in September 2016. (R. 14, at PageID.117.) The purpose was "[t]o help control me," which referred to his alcohol use. (*Id.*)

### iv.       The Vocation Expert's Testimony

The ALJ asked the vocational expert (VE) to imagine

> a person of the claimant's age, education and work experience and skillset who is able to perform work at all exertional levels. But because of the conditions and medications, symptoms, no climbing ladders, ropes or scaffolds; avoid all use of hazardous moving machinery, avoid all exposure to unprotected heights. Work is limited to simple, routine and repetitive tasks performed in a work environment free of fast-paced production requirements, involving only simple work-related decisions and with few, if any, work place changes. I know Mr. Brennan testified no problems with people but medical evidence seems to indicate otherwise. Brief superficial interaction with the public, and with coworkers and supervisors.

(R. 14, at PageID.123.) Could that individual perform Plaintiff's past work? (*Id.*) Yes, the VE responded, he could work either in the Teamster position or in the stock work at Menards. (R. 14, at PageID.124.) There would be other jobs available as well, such as a packer or cleaner (each had 10,000 positions available in southeast Michigan, 800,000 nationally), or a bench assembler (450,000 jobs nationally). (*Id.*) If, in addition to the above limitations, the individual could not stay on task even 80 percent of an eight-hour workday, no jobs would be available, according to the VE. (*Id.*) More than 20 percent of time off

24

task or a couple missed workdays a month would preclude employment. (R. 14, at PageID.124-125.)

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[10] carve the evidence into two categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the

---

[10]   Various amendments have been made to the regulations since Plaintiff filed his claim. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). Because the changes do not alter the outcome here—and, relatedly, they do not appear to exercise an impermissible retroactive effect on Plaintiff's rights, as the amendments are largely procedural changes in the process for analyzing evidence, *cf. Combs v Comm'r of Soc. Sec.*, 459 F.3d 640, 647 (6th Cir, 2006)—and the parties do not discuss them, it is unnecessary to determine whether they apply. Therefore, like many other courts, I will utilize the regulations in effect when Plaintiff filed his claim and the case was decided by the ALJ, along with the new regulations that explicitly apply to claims during this period. *See, e.g.*, 20 C.F.R. § 404.1527; *see generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed Reg. 62560, 62578 (September 9, 2016); *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same))); *Miller v. Comm'r of Soc. Sec.*, No. 1:17CV0718, 2018 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *rep. & rec. adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *rep. & rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4 n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case).

Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, he is entitled to the benefit of the treating-source rule.  Under that rule, certain opinions from his treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at

26

544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).[11] Credibility determinations regarding a claimant's subjective complaints rest

---

[11] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has

with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir.

1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling

reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v.*

*Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating

subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996

WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by

confirming that objective medical evidence of the underlying condition exists. The ALJ

then determines whether that condition could reasonably be expected to produce the

alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20

C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v.*

*Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the

extent of the work-related limitations by determining the intensity, persistence, and limiting

effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of*

*Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*,

749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's

description of his or her physical or mental impairments will "not alone establish that [he

---

remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District
that have continued to apply SSR 96-7p to cases arising prior to its rescission.  *See, e.g., Cooper v. Comm'r*
*of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted*
*by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL
2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July
7, 2017).

or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider the following factors:

    (i)    [D]aily activities;
    (ii)   The location, duration, frequency, and intensity of . . . pain;
    (iii)  Precipitating and aggravating factors;
    (iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
    (v)   Treatment, other than medication, . . . received for relief of . . . pain;
    (vi)  Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

### G.    Arguments and Analysis

The arguments and analysis in this case must be viewed through the prism of the statutes and regulations governing substance abuse. I will address this legal framework before turning to Plaintiff's specific arguments, which include challenges to (1) the ALJ's listing analysis, (2) the ALJ's interpretation of the medical opinions, and (3) the Appeals Council's treatment of new evidence.

### 1.    Substance Abuse and the Disability Determination

Until 1996, addiction did not bar a claimant from receiving benefits—in fact, in some periods, benefits could be awarded on the basis of addiction. *See* Warnecke Miller &

29

Rebecca Griffin, *Adjudicating Addicts: Social Security Disability, the Failure to Adequately Address Substance Abuse, and Proposals for Change*, 64 Admin. L. Rev. 967, 973-976 (2012). Congress, however, passed the Contract with America Advancement Act of 1996, Pub. L. No. 104-121, § 105, 110 Stat. 847 (1996), which amended 42 U.S.C. § 423 to deny benefits when disability was caused by addiction. The statute now reads, "An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C).

The regulations create a process for determining the materiality of addiction, which comes into play once the claimant is found disabled when considering his substance abuse and all other impairments. *See* SSR 13-2p, 2013 WL 621536, at *4 (Feb. 20, 2013) ("Under the Act and our regulations, we make a [drug addiction and alcoholism (DAA)] materiality determination only when" the evidence establishes a substance abuse disorder and "[w]e find that the claimant is disabled considering all impairments, including the DAA."); *Barrett v. Berryhill*, 904 F.3d 1029, 1032 (7th Cir. 2018) ("An ALJ must determine if a claimant's drug or alcohol addiction is material to his or her disability only if the ALJ first finds that the claimant is disabled."). The regulations provide:

> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
>
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current

30

disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

>(i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

>(ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. § 404.1535(b).

The rule's aim is to isolate the effects an addiction has on a finding of disability— would the claimant remain disabled if he was not a substance abuser? *See Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006) ("When an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the administrative law judge is whether, were the applicant not a substance abuser, she would still be disabled."). Or, to put it in legal jargon, the ALJ must determine if the addiction is a "but for" cause of the claimant's disability. *See* Dru Stevenson, *Should Addicts Get Welfare? Addiction & SSI/SSDI*, 68 Brook. L. Rev. 185, 193 (2002) ("In practice, this standard functions as a 'but-for' test: if the applicant's disability would not exist *but for* continuing substance abuse . . . then Social Security will deny the claim."). This analysis can be accomplished by comparing a claimant's functioning during periods of sobriety and periods of relapse. *Monateri v. Comm'r of Soc. Sec.*, 436 F. App'x 434, 443 (6th Cir. 2011).

Though the circuits are split on who bears the burden of proving materiality, Max Selver, *Disability Benefits and Addiction: Resolving an Uncertain Burden*, 91 N.Y.U. L.

31

Rev. 954 (2016), and the Sixth Circuit does not appear to have directly weighed in, district courts in this circuit have placed the burden on the claimant, *see, e.g.*, *Jones obo Jones v. Comm'r of Soc. Sec.*, No. 16-11206, 2017 WL 9476833, at *9 (E.D. Mich. Apr. 21, 2017), *rep & rec. adopted by* 2017 WL 3262444 (E.D. Mich. July 31, 2017); *Armstrong v. Comm'r of Soc. Sec.*, No. 1:07-cv-1212, 2009 WL 723988, at *5 (W.D. Mich. Feb. 24, 2009). The Commissioner has instructed likewise. SSR 13-2p, 2013 WL 621536, at *4 ("[I]t is our longstanding policy that the claimant continues to have the burden of providing disability throughout the DAA materiality analysis.").[12]

---

[12] An internal teletype the Commissioner drafted in 1996 "could be read to endorse a presumption in favor of the applicant," such that the Commissioner would need to bear the burden of proving materiality. *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 125 (2d Cir. 2012) (discussing Questions and Answers Concerning DAA from the 07/02/96 Teleconference–Medical Adjudicators, EM–96200 (Aug. 30, 1996)). Yet, as the Second Circuit recognized, the teletype lacks the force of law, and its power depends on its ability to persuade. *Id.*

    In this regard, the case for placing the burden on the claimant is strong, beginning with the observation that the 1996 amendments tweaked the definition of "disability," which the claimant must prove. *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999). One commentator countered this argument by suggesting that the amendments merely created an exception to the definition of disability rather than "chang[ing] what it means to be disabled under the Act." Selver, *supra*, at 91 N.Y.U. L. Rev. at 977-978. This is important, according to the commentator, because of the longstanding interpretive rule that "'the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits.'" *Id.* at 978 (quoting *N.L.R.B. v. Ky. River Comm'y Care, Inc.*, 532 U.S. 706, 711 (2001)).

    Of course, even characterized as an "exception," the addiction provision does not exempt claimants from a *prohibition*. But even if the interpretive rule were given its broader phrasing—that proving an exception to a statutory regime rests with the proponent of the exception, which here would be the Commissioner—an "important distinction exists between exceptions to statutory regimes and exclusions from the class of entities defined as within the reach of a statutory regime." *E.E.O.C. v. Chicago Club*, 86 F.3d 1423, 1430 (7th Cir. 1996). From this perspective, Congress has defined "disability" to exclude those who would qualify only because of addiction, and thus this class would never fall within the definition to begin with—this is unlike the scenario in which the class fit within the definition but was excluded by "[s]eparate provisions or exceptions [that] curtail or restrict the operation of a statute in a case to which it would otherwise apply." *Id.*; *cf. id.* at 1431 ("Congress defined private clubs as outside the ambit of Title VII, and it is difficult to imagine how any rule of statutory construction could necessitate the sacrifice of so explicit a legislative directive."). From this perspective, Congress's decision to exclude substance abusers from the statutory definition of "disability" does not suggest that it wanted the Commissioner to bear the burden.

### 2.      Listing Analysis

#### i.      Background on Listings

Plaintiff argues that the ALJ bungled the step-three listing analysis. (R. 17, PageID.508-514.) Two listings are at issue, 12.02 and 12.04. Both require the claimant to meet various "A criteria" (§ 12.02A and § 12.04A), and either "B criteria" (§ 12.02B and § 12.04B) or "C criteria" (§ 12.02C and § 12.04C). While the A criteria differ for each listing, the B and C criteria are identical. 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, §§ 12.02, 12.04 (Jan. 2017).

Listing 12.02's A criteria can be met by showing "a significant cognitive decline from a prior level of functioning in one or more of the cognitive areas" of complex attention, executive function, learning and memory, language, perceptual-motor, or social cognition. *Id.* Listing 12.04's A criteria requires a showing of depressive disorder or bipolar disorder, each evidenced by various markers not relevant here. *Id.* § 12.04A.

The B criteria in § 12.02B and § 12.04B are:

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

---

Other reasons exist to allocate the burden to the claimant. *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 125 (2d Cir. 2012) ("(1) [C]laimants bear the general burden of proving they are 'disabled,' the definition of which excludes disabilities materially caused by DAA; (2) claimants are better positioned to offer evidence relevant to DAA materiality; (3) the Teletype's burden allocation undermines the CAAA's aims; and (4) neither Congress nor the Commissioner has acted to 'correct' the judiciary's imposition of this burden upon claimants."); *Brown*, 192 F.3d at 498 (noting that the regulations prescribe only five steps, the 1996 amendments did not add the addiction-materiality consideration as a sixth step, and that the Commissioner's step-five burden exists only due to judicial gloss, which should not be extended without a clearer expression of congressional intent).

Regardless, the issue is irrelevant here because Plaintiff acknowledges he bears the burden, (R. 17, at PageID.508), and even assuming it was on the Commissioner, the burden was met for the reasons discussed in this Report.

1. Understand, remember, or apply information (see 12.00E1).

2. Interact with others (see 12.00E2).

3. Concentrate, persist, or maintain pace (see 12.00E3).

4. Adapt or manage oneself (see 12.00E4).

20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, §§ 12.02B, 12.04B (Jan. 2017). "Extreme limitation" means an inability to "function in [an] area independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(2)(e) (Jan. 2017). A "marked limitation" is one in which the claimant's ability to function in an area "independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(2)(d) (Jan. 2017). A "moderate limitation," by contrast, leaves the claimant with "fair" functioning "independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(2)(c) (Jan. 2017).

The four specific B criteria "areas" are also defined. First, "[u]understand, remember, or apply information . . . . refers to the abilities to learn, recall, and use information to perform work activities." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(1) (Jan. 2017). Second, "[i]nteract with others . . . refers to the abilities to relate to and work with supervisors, co-workers, and the public." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(2) (Jan. 2017). Third, "[c]oncentrate, persist, or maintain pace . . . refers to the abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(3) (Jan. 2017). Fourth, "[a]dapt or manage oneself . . . refers to the abilities to regulate emotions, control behavior, and

34

maintain well-being in a work setting." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(4) (Jan. 2017).

> The C criteria—the alternative to B criteria—require the following:
>
> Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
>
> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
>
> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, §§ 12.02C, 12.04C (Jan. 2017). The C(1) criterion mandates a showing that the treatment frequency is "consistent with accepted medical practice for the type of treatment or evaluation required for your medical condition." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00G(2)(b) (Jan. 2017). The term "marginal adjustment" in the C2 criterion "means that your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00G(2)(c) (Jan. 2017). Thus when changes and increased stress exacerbate a claimant's conditions, that is evidence of marginal adjustment. *Id.*[13]

---

[13] In addition to these provisions, 20 C.F.R. § 404.1520a tells claimants that the Commissioner will also use a "special technique" when evaluating the listings. One part of this technique, 20 C.F.R. § 404.1520a(c)(2), explains that a claimant's "ability to function independently, appropriately, effectively, and on a sustained basis" depends on "such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings

ii. **Analysis**

1. **Updated Medical Equivalency Opinion**

Plaintiff first suggests that the ALJ should have obtained an updated opinion on the medical equivalency of Plaintiff's impairments to the listings. (R. 17, at PageID.510.) At the initial-determination stage, on August 8, 2015, Dr. Valorie Domino found Plaintiff did not meet or equal the listings. (R. 14, at PageID.137-138.) The ALJ acknowledged that the evidence, at first blush, seemed to satisfy the C criteria—in particular, Plaintiff's history of residing at programs and with his parents appeared to support his need for a highly structured living setting. (R. 14, at PageID.78.) But the ALJ observed that Plaintiff was placed in these settings to help stop him from drinking, and thus they were not relevant evidence of his inability to live independently. (*Id.*)

Plaintiff thinks that because the ALJ admitted the evidence appeared to meet the C criteria, an updated opinion on medical equivalency should have been ordered. (R. 14, at PageID.510.) The only point Plaintiff puts forward directly in favor of the need for a new equivalency opinion—Plaintiff seems to drop the equivalency argument fast, turning to the merits of the ALJ's C criteria analysis—is that Dr. Domino did not reference any of the structured settings that Plaintiff had been placed in. (*Id.*)

The argument on equivalency fails to persuade. As an initial matter, Plaintiff

---

in which you are able to function." *See also Kramer v. Soc. Sec. Admin.*, No. 08–15198, 2010 WL 451055, at *11-12 (E.D. Mich. Jan. 28, 2010) (explaining the full "special technique" in detail). The "technique" applies to steps two and three of the ALJ's sequential evaluation, not to the development of the RFC in the later stages. *Erbland v. Comm'r of Soc. Sec.*, No. 1:13–CV–93, 2015 WL 5578020, at *4 (W.D. Mich. Sept. 22, 2015). Plaintiff's arguments do not address the "special technique."

provides no support for the proposition that the experts offering equivalency opinions must jot down all the evidence they consider. Even so, Dr. Domino's report canvasses swathes of the record, giving confidence that she was familiar with the evidence available to her. (R. 14, at PageID.136-139.)

Some of the evidence absent from Dr. Domino's report, like the 24-hour supervision prescribed in September 2016, came after the report was completed. But this is no basis for reversal. The Commissioner's guidance on ordering an updated equivalency opinion is found in SSR 96-6p, 1996 WL 374180 (July 2, 1996). The Sixth Circuit reads that ruling as requiring an updated opinion

> when either (1) there is evidence of symptoms, signs and findings that suggest to the ALJ or appeals Council that the applicant's condition may be equivalent to the listings; or (2) when additional medical evidence is received that 'in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding' that the impairment does not equal the listings.

*Kelly ex rel. Hollowell v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 830 (6th Cir. 2009). The ALJ has leeway because the equivalency opinion usually is rendered at the initial stage, as it was here; by the time the ALJ hears the case, new evidence will almost always be presented. *Id.* at 831. If the presence of new evidence were enough to mandate a new opinion, then updates on equivalency would be a matter of course. Consequently, the Sixth Circuit has noted the higher burden for updates: "Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a [time] gap exists does not warrant the expense and delay of a judicial remand." *Id.* (citation omitted); *see also Harper v. Comm'r of Soc. Sec.*, No. 15-CV-13971, 2017 WL 2242510, at *4 (E.D. Mich.

May 23, 2017) ("Sixth Circuit precedent places a more onerous burden on the Plaintiff to show the need for an updated medical expert opinion.").

To the extent Plaintiff attempts to meet this burden, his argument takes the form of a direct challenge to the ALJ's reasoning on the C criteria, which I will address next. But he has not isolated the new evidence and shown why it would lead to the conclusion that his impairments are equivalent to the listings. Consequently, his argument that an updated equivalency opinion was required appears to be an unnecessary and unsuccessful overlay to his argument on the merits, and it should be rejected.[14]

## 2.   "C Criteria" Analysis

Plaintiff's main thrust is that the "ALJ erroneously opinions [*sic*] that Plaintiff would not require a structured setting," part of the C criteria, "in the absence of drugs and alcohol." (R. 17, at PageID.510.)[15] Much of Plaintiff's argument contains uncited assertions about his time at Dignitas, noting that he could not successfully transition home, was readmitted in 2012, and remained until 2013; further, he notes that Adams (who wrote the letter about his time there) mentioned that Dignitas assisted Plaintiff "with deficits with memory, attention, inappropriate social interactions and judgment," enabling him to

---

[14] Later in his brief, Plaintiff recasts his argument about Dr. Domino as a challenge to the weight the ALJ accorded her opinion. (R. 17, at PageID.518.) The refashioned argument comprises a single sentence, adding nothing new, and therefore it fails for the reasons given above regarding the equivalency and "C criteria" arguments.

[15] He supports the arguments by extra-record materials, specifically Dignitas's website and a letter from Dr. Perlman to the Appeals Council. (R. 17, at PageID.511-512.) It appears that Plaintiff also believes that the ALJ lacked access to Adams's letter, but he is mistaken, as it appears in the record and was cited in the ALJ decision's exhibit list. (R. 14, at PageID.89, 495.) In these circumstances, the Court cannot consider the newly submitted materials to determine whether the ALJ erred. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Instead, these documents come into play in Plaintiff's third argument, which cites them as new and material evidence justifying a remand.

maintain employment. (R. 17, at PageID.511-512.)[16] He also notes that Plaintiff had a

guardianship, "Dr. Seigerman wrote of Plaintiff's cognitive decline," and "Dr. Perlman

wrote that he is unable to maintain residency in his home and without supervision he is

chronically unsuccessful." (R. 17, at PageID.511.) All of this evidence, Plaintiff claims,

was simply ignored in the decision. (R. 17, at PageID.512.)

Plaintiff's argument fails to persuade. His stay at Dignitas preceded the alleged

onset of his disability. In any event, no records appear from his time at the program, nor

does any contemporaneous evidence suggest the precise reasons he was there. Nothing

states he was treated at Dignitas for cognitive issues unrelated to alcoholism; perhaps such

treatment could be inferred from Adams's letter, as it says that he was admitted "for

Traumatic Brain Injury," but on the other hand she expressly mentions that it was Plaintiff's

relapses with alcohol that led to the need for direct supervision. (R. 14, at PageID.495.) At

best, her brief letter simply details some areas of treatment rather than any underlying

diagnoses. For his part, Dr. Seigerman discussed Plaintiff's cognitive impairments, apart

from his alcoholism, yet did not opine on his need for a structured environment. (R. 14, at

PageID.439.)

As for Dr. Perlman's statement, Plaintiff fails to locate it in the record, a telling

oversight because Dr. Perlman's records and related material indicate that he believed

Plaintiff needed supervision due to alcoholism. For example, at one point he thought

---

[16] He further asserts, again without citing the record, that he remained at Dignitas until discharged in 2010. (R. 17, at PageID.503.) As Defendant points out, the record lacks the dates of his earlier stays, particularly when he entered. (R. 20, at PageID.550.)

Plaintiff should "get involved in transitional housing for patients with addiction" if he could not abstain from alcohol by himself. (R. 14, at PageID.363.) When Dr. Perlman, along with case manager Krumm, ordered supervision beginning in September 2016, Plaintiff stated it was due to alcoholism. (R. 14, at PageID.117, 497.) At the very least, nothing from Dr. Perlman suggests that Plaintiff's cognitive impairments alone necessitated direct supervision. The one comment in that direction was that Plaintiff could consider returning to the brain injury unit at Dignitas for the "social-recreational integration program, and self-medication program with assistance." (R. 14, at PageID.363.) Presumably, the self-medication portion dealt with alcoholism, making Dr. Perlman's statement at best ambiguous about why Plaintiff needed structure. And, recall, Dr. Perlman suggested this only as an "option," not a necessary course of action.

Additionally, Plaintiff disregards the substantial evidence supporting the conclusion that any need for a structured setting related to his addiction rather than to other impairments. The ALJ thoroughly recounted the consistent evidence linking Plaintiff's need to supervision to his addiction. (R. 14, at PageID.78.) The explanations for staying with his parents always involved his alcohol abuse. *See* (R. 14, at PageID.96, 99-100, 345, 397, 405, 479.)[17] At one point, too, Plaintiff told Dr. Kamoo he could live independently, a sentiment he never appears to have walked back. (R. 14, at PageID.487.) This adds up to

---

[17] Dr. Kamoo made a convoluted connection between drinking and structured living, noting Plaintiff's "inability to live at home independently is also lending itself to this [i.e., drinking], but he clearly understands the concern of other professionals about this being a fertile ground for him to try and drink on his own." (R. 14, at PageID.483.) The causal direction of the statement is difficult to discern—was the inability to live alone (due to some non-addiction related reason, perhaps), the source of his drinking or was living alone causing him to drink? The statement is unclear, although its ending leaves the impression that Plaintiff could not be left alone because he would drink.

substantial evidence supporting the ALJ's C criteria analysis.[18]

### 3.   "B Criteria" Analysis

Plaintiff ends his first argument by attacking the ALJ's analysis of the B criteria. (R. 17, at PageID.513-514.) Regarding the concentration, persistence, or maintenance of pace prong, the ALJ acknowledged the mixed evidence, discussing the range of low and average test scores; the observed differences in Plaintiff's visual and auditory attention levels; "abnormal attention and calculations" findings at "numerous examinations"; "good attention and concentration" findings at psychiatrist appointments; Plaintiff's post-onset work history, including his ability to maintain long-term employment while sober and his more recent record of logging four consecutive 66-hour work weeks at Menards; his ability to use the computer; and his daily tasks, which included significant yard work, housework, and personal care. (R. 14, at PageID.73.) While Plaintiff was fired from the restaurant for being too "slow," the ALJ observed that such work was fast-paced and high-stress, so an inability to keep up did not indicate significant problems. (R. 14, at PageID.77.) Given this evidence, the ALJ concluded that Plaintiff had only mild limitations in concentration, persistence, and pace when sober. (*Id.*)

Arguing against this reasoning, Plaintiff opts to focus on other evidence (some of which the ALJ considered): Dr. Perlman's notes showing an abnormal fund of knowledge,

---

[18] In Plaintiff's reply brief, he takes the Commissioner to task for arguing that Plaintiff admitted at the hearing he did better in structured environments because they helped keep him sober. (R. 22, at PageID.569.) The snippet of dialogue provided in his brief shows that the ALJ asked him, "so would you say that you do a lot better with, you know, structured environment," to which he answered, "unfortunately, yes." (*Id.*, quoting R. 14, PageID.100 (quotation marks removed).) But he further explained, when asked if his parents provide him a structured environment, that they did "[b]ecause they don't drink." (R. 14, at PageID.101.)

lack of insight, and attention deficit; Adams's letter stating that he received treatment for concentration; and Dr. Seigerman's conclusion that he lost the Teamster job due to cognitive decline. (R. 17, at PageID.513.)

Plaintiff's approach essentially pits his evidence against the ALJ's, a tack with slim prospects. This is because the substantial-evidence standard "'presupposes that there is a zone of choice within which the decisionmakers can go either way'"; thus, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citations omitted).

Such is the case here: The ALJ's pile of substantial evidence is left undisturbed by Plaintiff's arguments. The ALJ compared Plaintiff's concentration, memory, and pace during periods of sobriety and addiction, *cf. Monateri*, 436 F. App'x at 443, correctly noting that he maintained long-term employment when sober and lost work when not. (R. 14, at PageID.77.) Plaintiff said something similar, telling Dr. Wagenheim in August 2014 that staying sober kept his work productivity high. (R. 14, at PageID.331.) Moreover, Plaintiff does not suggest that the ALJ mischaracterized Dr. Perlman's evidence—which the ALJ admitted gave some support for Plaintiff's position—or the mixed test results from Dr. Seigerman. (R. 14, at PageID.73, 347, 355, 360, 433-439.) Merely pointing out the same evidence the ALJ considered, without explaining any errors, amounts to an implicit argument that these reports deserved greater weight—but the Court cannot reweigh the evidence. *See Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th Cir. 1982).

Regarding Adams's letter, it says only that Plaintiff received help with memory, attention, judgment, and social interactions. (R. 14, at PageID.495.) It does not indicate the severity of the impairments or the nature of the assistance Plaintiff received. Relying on it would have been an unfounded leap of logic that the undescribed issues must have been bad if they required treatment at Dignitas.

As for Dr. Seigerman's conclusions—specifically, that Plaintiff's cognitive decline explains losing the Teamsters job—this essentially duplicates Plaintiff's subsequent argument (addressed below) that the ALJ should have given greater weight to the doctor's opinion. (R. 17, at PageID.515.) To the extent he adds anything independent in his argument concerning the B criteria, it would not be enough to change the outcome. The opinion did not directly bear upon Plaintiff's concentration, persistence, and pace. Rather, it dealt with a subject that appears far afield from Dr. Seigerman's areas of expertise— namely, the vocational demands of Plaintiff's job and why he lost it.[19] And, as the ALJ recognized, the opinions were speculative, stating what Dr. Seigerman "suspect[ed]" about events years earlier. (R. 14, at PageID.80, 439.) Consequently, Dr. Seigerman's musings did not merit a narrower view of Plaintiff's concentration, persistence, and pace—at least not enough to matter.

The final piece of Plaintiff's argument addresses the social functioning prong of the

---

[19] A medical opinion is a statement "about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Why Plaintiff was fired does not clearly fit this definition. Even as a medical opinion, it should be assessed based on, among other things, the source's specialty on the opinion's subject matter, which here was at least as much vocational as medical. 20 C.F.R. § 404.1527(c).

B criteria, which the ALJ found was moderately limited regardless of alcoholism. (R. 14, at PageID.77.); 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A2, § 12.00E(2) (Jan. 2017). Once more, he relies on Adams's letter and Dr. Perlman's notes, as well as a single instance when Dr. Kamoo noted his struggles to relate to others, (R. 14, at PageID.417),[20] his mother's comment on his lack of friends, and his formal guardianship. (R. 17, at PageID.513-514.)

Again, this argument simply ladles out Plaintiff's preferred evidence, with the implication that the ALJ should have relied on it—he does not contend that the ALJ mischaracterized any evidence, nor does he address the materials the ALJ relied on.

The ALJ considered the entirety of the evidence in reaching his conclusion. He noted, for example, Plaintiff's problems with coworkers, his exclusion from a group for drinking, and his low test scores on social understanding; at the same time, the ALJ observed that Plaintiff endeavored to be social, enjoyed his current job because it enabled interaction with others, went on dates, and attended social outings. (R. 14, at PageID.72.) The record supports the ALJ's depiction of the evidence. (R. 14, at PageID.328, 329, 331, 353, 358, 423, 427, 466, 467.) Because the decision addressed all the pertinent evidence and employed proper reasoning, any disagreement with it would merely reflect the Court's own weighing of the evidence. Accordingly, Plaintiff has not demonstrated error requiring

---

[20] Plaintiff leaves out, however, Dr. Kamoo's earlier impression that Plaintiff "strikes me as a social person." (R. 14, at PageID.427.)

reversal.[21]

### 3.    Medical Opinion Analysis

Plaintiff's second argument is that the "ALJ erred in weighing the opinion evidence." (R. 17, at PageID.514.) He begins with Dr. Seigerman's opinions, which the ALJ accorded "little weight" because they were speculative (as explained above), clashed with Plaintiff's testimony, and generally lacked corroboration. (R. 14, at PageID.80-81.) More particularly, the ALJ noted that there was "no objective support for [Dr. Seigerman's] supposition that the claimant's cognitive abilities had declined over time," Dr. Seigerman "does not cite any verifiable and definitive decrease in the claimant's memory, concentration, fund of knowledge, or executive functioning," and he did not reference any prior findings. (R. 14, at PageID.80-81.) Further, no other evidence indicated a decline in functioning—Plaintiff never complained of a decline and his daily functioning remained stable. (R. 14, at PageID.81.) Finally, the ALJ noted that, contrary to Dr. Seigerman's speculation, the evidence showed that Plaintiff had lost his Teamsters job because of drinking. (*Id.*)

Plaintiff attempts to bolster Dr. Seigerman's conjectures with some guesswork of his own: "While the ALJ noted the 1988 report was not available, the fact that the same doctor [*i.e.*, Dr. Seigerman] conducted both examinations supports the statement of cognitive abilities declining over time if he had compared reports." (R. 17, at PageID.515.)

---

[21] Plaintiff only addresses two of the four B criteria domains: concentration, persistence, and pace; and social functioning. His brief mentions in passing another domain, adaptation, but fails to develop any argument regarding it.

So, "if [Dr. Seigerman] had compared reports," then his statement is evidence of decline—but nothing indicates he did compare reports, and even if he did the ALJ was justified in wanting a bit more information about the prior report, as it would be the only contemporaneous evidence supporting the decline hypothesis.[22] Further, Dr. Seigerman's testing did not purport to provide a longitudinal view of Plaintiff's functioning. (R. 14, at PageID.436-439.)

Next, Plaintiff scours the record to find evidence of a decline in his daily activities. He observes that he lived at Dignitas through 2013, and when he left, he lost his job and eventually was placed under a guardianship and 24-hour supervised care. (R. 17, at PageID.516.) This attempt to construct a declension narrative from a few salient points is unpersuasive. First, it misleadingly crams the events together. As Defendant points out, "Plaintiff left Dignitas of his own volition in May 2013, a full 18 months before he was fired from his Teamsters position (and therefore well before his alleged onset of disability)." (R. 20, at PageID.546.) In other words, he managed to maintain employment for some time after leaving Dignitas, cutting against the implication that his treatment there was holding cognitive deterioration at bay. Second, the narrative ignores the causal forces connecting these events. Aside from Dr. Seigerman's opinion, all other evidence shows

---

[22] Somewhat confusingly, Plaintiff concludes that the lack of the prior report was not a "good reason for discounting" the medical opinion. (R. 17, at PageID.515.) The term "good reason" relates to the showing an ALJ must muster when declining to give a treating source's medical opinion controlling weight. 20 C.F.R. § 404.1527(c)(2). No argument has been presented that Dr. Seigerman was a treating source. Had Plaintiff actually argued the point, the fact that Dr. Seigerman's only appearance in the record was for isolated testing suggests he would not be a treating source. But since the argument is not before the Court, it need not be reached. *McClellan v. Astrue*, 804 F. Supp. 2d 678, 688 (E.D. Tenn. 2011) ("[A]rguments not raised and supported in more than a perfunctory manner may be deemed waived.").

that Plaintiff lost the Teamsters position and received 24-hour supervision due to drinking. (R. 14, at PageID.98, 117, 345, 467.) Thus, it was his drinking, not cognitive decline, that is the common causal factor among these events.

Plaintiff's final evidence of decline is that "Dr. Perlman's notes continue to reference an abnormal fund of knowledge, attention deficit, abnormal calculations," and lack of judgment and insight. (R. 17, at PageID.516.) Yet, a consistent attention deficit, for example, is not necessarily a growing deficit, and nothing else in Dr. Perlman's notes suggests deterioration, let alone any decline unrelated to drinking.[23] As such, these notes do not support Dr. Seigerman's conclusion about cognitive decline.

Next, Plaintiff challenges the ALJ's decision to give significant weight to nurse Krumm's letter—which described the recent order of 24-hour supervision—to the extent it demonstrated Plaintiff's addiction. (R. 17, at PageID.517; R. 14, at PageID.81-82.) According to Plaintiff, the round-the-clock care was simply "to allow Plaintiff to reside in his own home versus that [*sic*] with his parents"; "[t]here is no mention that this attendant care is related purely to alcohol abuse"; and Adams's letter about Dignitas "sheds light on the . . . need for 24-hour supervision in order to maintain his prior job at Teamsters." (R. 17, at PageID.517.)

---

[23] Plaintiff also takes issue with the ALJ's observation that Plaintiff "was not referred for inpatient treatment or formal residential care by any treating or examining medical source when he was not abusing alcohol." (R. 14, at PageID.81.) Not true, says Plaintiff: "Dr. Perlman's notes continually reference him leaving open the option of returning to supervised TBI treatment program at Dignitas." (R. 17, at PageID.517.) Dr. Perlman's references state, in full, "Continue to leave open the options of him returning to supervised Traumatic Brain Injury Treatment Program at Dignitas with the social-recreational integration program, and self-medication program with assistance." *See, e.g.*, (R. 14, at PageID.374, 379.) As noted above, this statement is ambiguous about why Plaintiff needed help; it never says that his cognitive state alone required it, and the reference to self-medication suggests that alcohol abuse was involved.

47

None of these rationales carries the day for Plaintiff. He admitted that he stayed with his parents because of his drinking and that his 24-hour supervision was ordered for the same reason. (R. 14, at PageID.117, 345.) Some other motivation might also have prompted these living arrangements, but none is ever mentioned. Adams's letter actually contradicts the thrust of Plaintiff's argument by stating that his "recurrent relapses with alcohol . . . required him to have 24 hours of direct supervision at times as ordered by Dr. Perlman." (R. 14, at PageID.495.)

At the end of this section of his brief, Plaintiff tucks a paragraph that is not clearly related to any specific medical opinion. It argues that the ALJ was mistaken in finding "that for a short period Plaintiff maintained sobriety and the record shows he was active as well as applying for jobs." (R. 17, at PageID.518.) The ALJ noted that Plaintiff had been active, both socially and while working on his parents' farm, during a seven-month period beginning in January 2015, and that he also was "generally successful at maintaining employment when he is not drinking." (R. 14, at PageID.79-80.) Plaintiff counters that, during this period, an examination showed he was "mildly distressed," that he missed a medical appointment, and that he lost two jobs for calling in sick. (R. 17, at PageID.518.) The upshot, according to Plaintiff, is that the "this evidence fails to suggest that Plaintiff could get up, get to work and sustain the demands of even an unskilled job in the absence of alcohol as implied by the ALJ." (R. 17, at PageID.518-519.)

But a single episode of mild or moderate distress and a lone missed appointment do not call the ALJ's reasoning into question. The ALJ was correct that during this period Plaintiff had spates of activity, both socially and vocationally. *See, e.g.*, (R. 14, at

48

PageID.465, 466-467, 477.) Nor do the job losses due to sick days hold much explanatory power, as it is unclear which sickness prevented him from working and why.

For these reasons, I conclude that Plaintiff's arguments about the medical opinions lack merit.

### 4.    New Evidence

Plaintiff's final argument is that new evidence—in particular, letters from Richard Burker, a Teamsters employee, and Dr. Perlman—justifies a remand. (R. 17, at PageID.519.) This argument must be addressed in two steps, the first dealing with its procedural stance and the second, its merits.

### i.    Jurisdiction to Review the Appeals Council

The procedural angle of Plaintiff's attack is misdirected. Instead of simply requesting remand based on "sentence six" of 42 U.S.C. § 405(g)—more on that below—he spends most of his argument justifying why he can directly challenge the Appeals Council's decision:

> The AC incorrectly found that new records submitted to the AC were not relevant to the period at issue and instead related to a later period of time. . . . As a result, the AC incorrectly found that it had no basis for changing the ALJ's decision or for considering the new evidence in the context of this case. 20 C.F.R. §404.970(b) explains that 'if new and material evidence is submitted, the AC *shall* consider the additional evidence' where 'it relates to the period on or before the date of the ALJ's hearing decision."

(R. 17, at PageID.519.) Plaintiff's argument suffers from two flaws.

First, the regulation applies to the Appeals Council's review process, not the court's. "While new material evidence may be submitted for consideration to the appeals council pursuant to 20 C.F.R. § 404.970, on appeal we still review the ALJ's decision, not the denial

of review by the appeals council." *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). As such, the regulation does not apply to the task at hand.

Second, and more important, the Court lacks jurisdiction over challenges to the Appeals Council's denial of appeal. The Court's jurisdiction is limited to reviewing final decisions. 42 U.S.C. § 405(g). If the Appeals Council denies review, the final decision is the ALJ's. 20 C.F.R. § 404.981. In such cases, even though the claimant might have submitted additional evidence to the Council, 20 C.F.R. § 404.970(a), that evidence "cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

For this reason, the Sixth Circuit has held that "[a]n Appeal Council order denying review is not . . . a reviewable order; such an order serves only to make the decision of the ALJ the final reviewable decision of the Secretary." *Meeks v. Sec'y of Health & Human Servs*, 996 F.2d 1215, 1993 WL 216530, at *1 (6th Cir. 1993) (unpublished). Accordingly, courts in this District usually find they lack jurisdiction to review the Council's denial orders. See *Smith v. Comm'r of Soc. Sec.*, No. 2:17-cv-13367, 2018 WL 7364646, at *10-11 (E.D. Mich. Oct. 26, 2018) (noting that "[o]f the courts in the Sixth Circuit that have considered the question, most have found they lacked jurisdiction to evaluate whether an ALJ complied with a remand order from the Appeals Council," and joining the majority), *Rep. & Rec. adopted by* 2019 WL 700096 (E.D. Mich. Feb. 20, 2019); *Roberts v. Comm'r of Soc. Sec.*, No. 17-cv-12458, 2018 WL 4478814, at *3 (E.D. Mich. Sept. 19, 2018). ("To the extent the objection is aimed at the Appeals Council's decision denying review, the magistrate judge correctly found that the order is unreviewable."); *Davis v. Comm'r of Soc.*

*Sec.*, No. 16-13495, 2018 WL 3259791, at *6 (E.D. Mich. Feb. 12, 2018) ("[T]he Appeals Council decision is not reviewable by this Court."), *Rep. & Rec. adopted by* 2018 WL 1150243, at *2 (E.D. Mich. Mar. 5, 2018) ("The magistrate judge correctly explained that this Court's review does not extend to the action of the Appeals Council when that body denies review."); *see also Smith v. Comm'r of Soc. Sec.*, No. 2:12-cv-12160, 2013 WL 5243448, at *16 (E.D. Mich. Sept. 18, 2013) ("[T]his Court harbors substantial doubt as to whether a federal court has the authority to grant any relief" for the Council's alleged violation of a regulation requiring the Council to allow for the filing of briefs.); *Freeman v. Comm'r of Soc. Sec.*, No. 1:07-cv-536, 2008 WL 2074019, at *4 (E.D. Mich. May 14, 2008) ("Even if plaintiff is correct in her claim that the Appeals Council failed to incorporate certain items in the administrative record and did not perform 'a reasoned and meaningful review' of the ALJ's decision, there is no basis for the court to perform a judicial review of the Council's orders.").

Other Circuits allow limited review for legal errors. For example, the Seventh Circuit has permitted review of whether the Council committed an error of law when determining whether evidence was new and material under 20 C.F.R. § 404.970(b). See *Stepp v. Colvin*, 795 F.3d 711, 722 (7th Cir. 2015); *Farrell v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012). The Eighth Circuit likewise has allowed review of that regulation's application: "Jurisdiction to review whether the Appeals Council has complied with the procedural requirements of the regulations does not imply jurisdiction to review the Appeals Council's non-final, substantive decision to deny review." *Browning v. Sullivan*, 958 F.2d 817, 822-23 (8th Cir. 1992).

The Sixth Circuit has not addressed the fine distinction cut by these cases. *See generally Marks v. Colvin*, No. 2:15-cv-0550, 2016 WL 233177, at *3 (S.D. Ohio Jan. 20, 2016) (noting that "[t]here does not appear to be any decisions from the Sixth Circuit" regarding "whether the Court can correct a regulatory violation which occurs during the process of Appeals Council Review"), *Rep. & Rec. adopted by* 2016 WL 814982 (S.D. Ohio Mar. 2, 2016); *Smith*, 2013 WL 5243448, at *16 (noting caselaw explaining that the Sixth Circuit has not yet adopted the distinction and allowed review of the Council's compliance with regulatory procedures). Noting the lack of caselaw, one court in this Circuit addressing an alleged violation of 20 C.F.R. § 404.970(b) adopted the Seventh Circuit's basic holding that "procedural errors made by the Appeals Council can, if they are apparent from the record, sometimes be corrected by a reviewing Court." *Marks*, 2016 WL 233177, at *4.

But as another court pointed out, "[Sixth] Circuit precedent suggests that a federal court lacks jurisdiction to review an Appeals Council decision denying a claimant's request to review an ALJ's decision." *Smith*, 2013 WL 5243448, at *16. Indeed, while not made when addressing the precise issue here, the Sixth Circuit's blanket statement that denial orders are unreviewable does not appear to admit of exceptions. See *Meeks*, 1993 WL 216530, at *1. The Circuit has even applied this holding to reject the argument that the Appeals Council violated a claimant's due process rights by allegedly failing to review his objections to the ALJ's decision. *Willis v. Sec'y of Health & Human Servs.*, 47 F.3d 1172,

1995 WL 31591, at *2 (6th Cir. 1995) (unpublished).[24]

These cases suggest that the Sixth Circuit would not find jurisdiction to review the Council's procedural errors. Such a holding would also reflect the textual grant of jurisdiction encompassing only final decisions, 42 U.S.C. § 405(g), which does not include the Council's denial order. Courts allowing limited review of those orders have not pointed to comparable statutory language authorizing such review.

Accordingly, I conclude that the Court lacks jurisdiction to review the Appeals Council decision.

### ii.    "Sentence Six" Remand

The proper way to obtain a remand for review of new evidence is to seek it under "sentence six" of 42 U.S.C. § 405(g). But Plaintiff's motion for summary judgment never mentions "sentence six," instead asking for remand under "sentence four" of 42 U.S.C. § 405(g). (R. 17, at PageID.522.) Plaintiff's reply brief mentions "sentence six" only in a

---

[24] More recently, the Sixth Circuit adopted the majority position that the Appeals Council's dismissal of an untimely request for review is not a final decision that a Court has jurisdiction to review. *Smith v. Comm'or of Soc.*, 880 F.3d 813, 814 (6th Cir. 2018). The Supreme Court has taken up the case, *Smith v. Berryhill*, 139 S. Ct. 451 (2018), and the government has reconsidered its position and "now conclude[s] that a dismissal order is subject to judicial review, limited to the procedural ground on which the agency based its dismissal." Resp. Brief, at 18, *Smith v. Berryhill*, No. 17-1606, *available at* https://www.supremecourt.gov/DocketPDF/17/17-1606/76992/20181219203659525_17-1606bsUnitedStates.pdf (last accessed Mar. 16, 2019). It is not clear, however, that a reversal in *Smith*, on the grounds that a dismissal order for untimeliness is final, would have any application to denial orders that are challenged on the basis that the Appeals Council erred in handling the new evidence. The most important distinction between *Smith* and cases like the present is that *Smith* deals with the Council's dismissal of an application for review, 20 C.F.R. § 404.971, rather than a denial of the application, 20 C.F.R. § 404.981 The latter regulation, as explained above, provides for a "final decision" that can be reviewed: the ALJ's. Another reason to doubt the relevance of *Smith* is that in the present context Congress set a path in "sentence six" of 42 U.S.C. § 405(g) for granting remands due to new evidence, and that path requires a showing of good cause. By contrast, 20 C.F.R. § 404.970—the putative grounds for finding Appeals Council error regarding new evidence—does not, on its face, contain a good cause requirement. As such, allowing review under the regulation could circumvent the statute.

heading asserting, "There is a basis to remand due to an alleged error by the Appeals Council or Pursuant to Sentence Six." (R. 22, at PageID.572.) Like his merits brief, however, the reply does not offer any analysis on sentence six, instead relying on 20 C.F.R. § 404.970(b). Thus, he never addresses the statutory requirement that "there [be] good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Consequently, Plaintiff has failed to present or develop any "sentence six" argument, and as such the issue should be deemed waived. *See Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) ("'[J]udges are not like pigs, hunting for truffles' that might be buried in the record." (citation omitted)); *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.'" (citation omitted)).

Nonetheless, I will address the merits of this hypothetical argument below.

### 1. Background Law

If a "sentence six" argument were preserved in this case, I would find that it fails. Courts are authorized to review certain final decisions of the Commissioner under 42 U.S.C. § 405(g):

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

54

Claimants can seek review of an ALJ decision by the Appeals Council, 20 C.F.R. §§ 404.967, 416.1467. But, as noted, when the Council denies review the ALJ's determination becomes the final reviewable decision, 20 C.F.R. §§ 404.981, 416.1481; *Meeks*, 1993 WL 216530, at *1, and any new evidence presented to the Council under 20 C.F.R. § 404.970(a), "cannot be considered part of the record for purposes of substantial evidence review." *Foster*, 279 F.3d at 357.

New evidence, however, can lead to a remand under one of the two types of remands allowed by 42 U.S.C. § 405(g). See generally *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 725 n.3 (6th Cir. 2014). The statute states in relevant part,

> [Sentence Four:] The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. . . . [Sentence Six:] The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g). A "'sentence four' remand involves a substantive ruling by the court as to the correctness of the Commissioner's decision and a subsequent remand for further proceedings in light of that determination." *Glasco v. Comm'r of Soc. Sec.*, 645 F. App'x 432, 434 n.1 (6th Cir. 2016). By contrast, a "sentence six" remand addresses cases in which new evidence has cropped up. See *Martinez v. Comm'r of Soc. Sec.*, No. 1:15-CV-605, 2016 WL 2907844, at *7 (W.D. Mich. May 19, 2016) ("When a plaintiff submits evidence that has not been presented to the ALJ, a court may consider the evidence only for the limited purpose of deciding whether to issue a sentence-six remand."). Such a remand does

55

not opine on the merits of the Commissioner's decision but rather "remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

Remand under "sentence six" is not appropriate unless the claimant shows: (1) "the evidence at issue is both 'new' and 'material,'" and (2) "there is 'good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Hollon ex. rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)). Evidence is new only if "it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Foster*, 279 F.3d at 357 (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). Any evidence offered after the ALJ's decision is potentially "new evidence" for purposes of the court's review. *Wyatt v. Sec'y of Health & Human Servs*, 12 F.3d 216, 1993 WL 492311, at *3 (6th Cir. 1993) (unpublished). It is material only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'" *Id.* (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)). This Circuit's "harder line" approach to "good cause" requires the claimant to "demonstrate[] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357. "It is well established that the party seeking remand bears the burden of showing that a remand is proper under Section 405." *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).

## 2.      Application

Plaintiff offers two letters written in March 2017 that the Appeals Council rejected, in denying review, because they did not relate to the period at issue as required by 20 C.F.R. § 404.970. (R. 14, at PageID.52.) The first, from Richard Burker, a supervisor at the Teamsters, explains that Plaintiff's brain injury "left him permanently intellectually and physically impaired and occasionally engaging in self-destructive and addictive behavior." (R. 14, at PageID.524.) Burker came onboard in June 2000, after Plaintiff already had been terminated "for unacceptable conduct." (*Id.*) Plaintiff eventually returned in May 2002, but had retained "somewhat disruptive behavioral idiosyncrasies, . . . sub-standard work and difficulty retaining information." (*Id.*) Plaintiff eked by "only at the lowest levels of acceptability," though Burker "found him to be likeable" and indeed felt "protective toward him," as did other supervisors, who "wished to give him every chance to succeed despite troubling, episodic lapses." (*Id.*) Ultimately, Plaintiff's "productivity, sociability, and reliability noticeably declined" and Burker "was forced to terminate him." (*Id.*)

The second letter, from Dr. Perlman, states that Plaintiff's alcoholism resulted from his brain injury and that "[h]e requires 24 hour supervision to be able to maintain the residency in his home and without this supervision he is chronically unsuccessful." (R. 14, at PageID.63.) Plaintiff "is not capable of sustaining competitive, fulltime, life-sustaining employment." (*Id.*) He could, instead, work only part-time, "about 12 hours per week, due to the level of supervision he requires." (*Id.*)

The first question in the "sentence six" analysis is whether this evidence is new. Both letters are technically "new" because they post-date the ALJ's decision. However, to

qualify as new, the evidence must not have existed *or* been "'available'" to Plaintiff at the time of the hearing. *Foster*, 279 F.3d at 357 (citation omitted). Plaintiff offers no reason why these letters were unavailable before the hearing, that is, why the letters could not have been written up in time for the hearing decision. Nonetheless, it is not clear that evidence created post-decision should be considered "old" (*i.e.*, not "new") simply because the evidence could have been created before the decision. Rather, the fact that evidence could have been developed and acquired by Plaintiff before the decision is a factor under the "good cause" analysis. See *Perkins v. Apfel*, 14 F. App'x 593, 598 (6th Cir. 2001) ("The mere fact that the evidence at issue was not created until nine months after the ALJ's decision and was not submitted to the Appeals Council until nearly a year after the ALJ's decision does not establish good cause. This Court takes a harder line: Perkins must establish good cause for his failure to obtain the evidence prior to the hearing."); *see also Oliver*, 804 F.2d at 966 (noting that "good cause" requires a reasonable justification for failing to timely acquire the evidence). Thus, I conclude that the evidence is "new," as Plaintiff case fails to meet the final two requirements in any event.

Next, is the evidence material? I cannot conclude it is. Plaintiff argues that it is material because it

> reflects that he suffered from cognitive deficiencies that were readily apparent on the on the job. This could have impacted how the ALJ assessed the Listing. Moreover, the ALJ finds that Dr. Seigerman's assessment regarding cognitive decline and termination was speculative to afford it little weight, yet [Burker's letter] directly contradicts the ALJ's analysis with respect to the report which again directs a finding of disability.

(R. 14, at PageID.522.) In his reply brief, he adds that Burker's letter "directly rebuts [the] finding" that Plaintiff's termination from the Teamsters was due to drinking. (R. 22, at PageID.573.) As for Dr. Perlman's letter, Plaintiff says only that it "should likewise impact how the ALJ weighed Dr. Perlman's assessment which is again supportive of a finding of disability." (*Id.*)

Of the two letters, Burker's is closer to being material, as it perhaps implies that Plaintiff's problems at work were separate from his drinking. For three reasons, however, I conclude that it is not material. First, the letter is entirely consistent with Plaintiff's having been fired for drinking; the letter never denies this, instead focusing on the behavioral manifestations that led to termination, such as problems with productivity, sociability, and reliability. These behaviors, however, could have resulted from drink—indeed, it is likely to prevent such behavior that workplaces ban substance use. *See* Jacques Normand, *et al.*, *Under the Influence?: Drugs and the American Work Force*, 155-159 (1994) ("Employees' alcohol and other drug use has also been associated with a variety of other job outcome measures. These include counterproductive behaviors . . . , job withdrawal behaviors . . . , low job productivity and difficult interpersonal relations at work," although variables other than substance abuse could also explain these outcomes.).

Second, even with this letter, the record would contain ample evidence that Plaintiff was fired for inebriation, including Plaintiff's reports to medical providers and testimony at the hearing. (R. 14, at PageID.98, 345, 433, 465, 467.) Thus, to credit Plaintiff's present interpretation of the letter, the ALJ would have to disbelieve Plaintiff's earlier evidence—

and, as noted above, Plaintiff's interpretation is strained because the letter is consistent with that earlier evidence.

Third, even if the letter required reinterpreting Plaintiff's termination from the Teamsters, that episode represents only one piece of evidence. As discussed above, the ALJ relied on other, substantial evidence for his conclusions, making irrelevant any overturning of his interpretation of the Teamsters termination. Thus, the letter is not material.

Plaintiff does not offer much argument on why Dr. Perlman's letter would change the outcome. The letter simply recounts Plaintiff's accident, contends that the injury caused his drinking, and concludes that Plaintiff can work only 12 hours or so a week. The letter is short and fails to explain the basis for Dr. Perlman's conclusion, which trenches upon a subject relegated to the ALJ: whether a claimant is disabled. *See* 20 C.F.R. § 404.1527(d) (The ALJ does not owe a treating opinion deference on matters reserved to the Commissioner and "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors.); *see also Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 474-475 (6th Cir. 2016) (noting that the court had "previously declined to give significant weight to rudimentary indications that lack an accompanying explanation," and that "[e]ven if the ALJ erred in failing to give good reasons for not abiding by the treating physician rule, it was harmless error because the [check-box analysis unaccompanied by explanation] here is 'weak evidence at best,'" (quoting *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010))).

Further, Dr. Perlman's letter fails to grapple with the key issue of whether Plaintiff's cognitive difficulties were disabling independent of substance abuse.[25] The letter does not speak to this question and Dr. Perlman had ordered 24-hour supervision on the basis of Plaintiff's addiction, not his cognitive troubles—this suggests, if anything, that Dr. Perlman was concerned about the substance abuse. (R. 14, at PageID.117.) Consequently, it does not appear that Dr. Perlman's letter was entitled much weight and could have swayed the ALJ, and therefore it was not material.

Finally, supposing Plaintiff could satisfy the "newness" and materiality requirements, he would founder on "good cause." He has not attempted to justify the tardiness of his "new" evidence and no reason for it is apparent. Dr. Perlman seems to have been available to Plaintiff leading up to the hearing and beyond. Nothing indicates Plaintiff requested a letter from him earlier or that Dr. Perlman was unable to provide it before March 2017. It might have been a good idea to ask the ALJ at the hearing to hold the record open for such a submission because, shortly before, Dr. Perlman had ordered 24-hour

---

[25] An undercurrent in the evidence is that Plaintiff's brain injury caused his substance abuse. *See, e.g.* (R. 14, at PageID.415, 419; R. 17, at PageID.524.) Plaintiff presents no argument to this effect, and it does not appear that the caselaw or even the medical literature has plumbed this topic, *i.e.*, whether a brain injury can cause addiction. *See* James M. Bjork & Steven J. Grant, *Does Traumatic Brain Injury Increase Risk for Substance Abuse?* 26 J. of Neurotrauma 1077, 1077 (July 2009) ("Virtually nothing is known, however, about whether TBI itself increases the risk of substance use disorder (SUD), especially in persons with no psychological or psychiatric risk factors for SUD at the time of injury."); *but cf.* Selver, *supra* 91 N.Y.U. L. Rev. at 984 (noting studies showing that "pre-existing mental disorders increase the risk of developing a substance abuse disorder"); David P. Graham & Aaron L. Cardon, *An Update on Substance Use and Treatment following Traumatic Brain Injury*, 1141 Annals N.Y. Acad. of Sci. 148, 148 (2008) (noting that "[w]hile recent reviews regarding substance abuse in TBI patients concur that substance-abuse rates decline even after mild TBI, an emerging literature suggests mild TBI may cause subtle impairments in cognitive, executive, and decision-making functions . . . [that] may increase the risk for chronic substance abuse in a subset of TBI patients"). What the statutory and regulatory framework would require in that scenario is not immediately apparent, but Plaintiff's lack of argument saves the Court from having to address the matter.

supervision. Yet, Plaintiff's representative at the time said that the record was complete. (R. 14, at PageID.93-94.)[26] The same goes for Burker, whom Plaintiff apparently had known since his time with the Teamsters and, it seems, was capable of providing a letter before March 2017.

Consequently, Plaintiff has not demonstrated "good cause" for failing to submit the evidence to the ALJ, and thus remand under "sentence six" is unwarranted.

## II.   CONCLUSION

For the reasons above, I recommend that Plaintiff's Motion for Summary Judgment, (R. 17), be **DENIED**, the Commissioner's Motion, (R. 20), be **GRANTED**, the Commissioner's final decision denying benefits be **AFFIRMED**,

## IV.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14

---

[26] Even if this is characterized as a misstep—something Plaintiff does not argue—it would not likely give "good cause." Courts generally hold that an attorney's errors do not constitute "good cause." As the Sixth Circuit has observed, "there is absolutely no statutory or decisional authority for . . . [the] unstated premise that the alleged incompetence of [the claimant's] first attorney constitutes 'good cause' in this context." *Taylor v. Comm'r of Soc. Sec.*, 43 F. App'x 941, 943 (6th Cir. 2002); see also *Jackson v. Comm'r of Soc. Sec.*, No. 07-14184, 2009 WL 612343, at *3 (E.D. Mich. Mar. 6, 2009) ("Mistakes by an attorney are not considered to be 'good cause' for purposes of a remand under Sentence Six."); *Jensen v. Berryhill*, No. 4:16-CV-272, 2018 WL 1542237, at *7 (E.D. N.C. Mar. 29, 2018) ("Courts have repeatedly held that attorney mistakes are not considered 'good cause' in this context."); *Cross v. Colvin*, No. 6:16-CV-0111, 2016 WL 7011477, at *5 (N.D. N.Y. Dec. 1, 2016) ("[T]he omissions of Plaintiff's former counsel do not establish good cause to obtain a sentence six remand."); *Shaver v. Colvin*, No. 3:13-CV-00388, 2014 WL 3854143, at *5 (W.D. N.C. Aug. 6, 2014) ("Courts around the country, however, have repeatedly held that '[m]istakes by an attorney are not considered to be 'good cause' for purposes of a remand under Sentence Six.'" (citation omitted)). This Court has rejected arguments that counsel's "past failure to supplement the record" represents "good cause." *Firth v. Comm'r of Soc. Sec.*, No. 2:16-cv-14165, 2017 WL 4169632, at *8 (E.D. Mich. July 27, 2017), Rep. & Rec. adopted by 2017 WL 4163684 (E.D. Mich. Sept. 20, 2017). Even an "inadvertent omission by prior counsel" in submitting evidence is not "good cause" for the failure. *Patel v. Shalala*, 17 F. Supp. 2d 662, 667 (W.D. Ky. 1998); see also *Shuter v. Astrue*, 537 F. Supp. 2d 752, 758-59 (E.D. Pa. 2008) (rejecting "good cause" where the administrative counsel failed to submit evidence due to an unexplained "misunderstanding" with the plaintiff).

days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  March 25, 2019                            S/ PATRICIA T. MORRIS
                                                 Patricia T. Morris
                                                 United States Magistrate Judge

## **<u>CERTIFICATION</u>**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: March 25, 2019     By <u>s/Kristen Castaneda</u>
            Case Manager